IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ROBERT GLENN MILLIRON, | CASE NO. 1:22-cv-1200 |
| Plaintiff, | DISTRICT JUDGE JAMES S. GWIN |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Robert Milliron filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In November 2015 and early March 2017, Milliron filed applications for Supplemental Security Income alleging a disability onset date of December 1, 2012,[1] and claiming he was disabled due to neck and back injury with chronic

---

[1]      "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

pain, torn anterior cruciate ligament (ACL) in his left knee, chronic major depression, post-traumatic stress disorder, degenerative disc disease in his cervical spine, carpal tunnel syndrome, brachial plexus dysfunction,[2] coronary heart disease, and right main coronary artery thrombosis. Tr. 158, 285, 319. The Social Security Administration denied Milliron's application and his motion for reconsideration. Tr. 136, 159. Milliron then requested a hearing before an Administrative Law Judge (ALJ). Tr. 200.

In August 2018, an ALJ held a hearing, Tr. 37–60, and the next month issued a written decision finding that Milliron was not disabled, Tr. 155–73. Milliron appealed, and about a year later the Social Security Appeals Council remanded the case back to the ALJ. Tr. 178–81.

In May 2020, a different ALJ held a hearing. Tr. 61–87. The next month the ALJ issued a partially favorable written decision finding that Milliron was disabled as of May 2019 when Milliron turned 55 years old, but not before that date. Tr. 12–31. Milliron appealed and the Appeals Council declined further review. Tr. 1–3. Milliron appealed to the United States District Court for the Northern District of Ohio. The parties stipulated to a remand and in October

---

[2]     The brachial plexus "is a network of nerves in the shoulder that carries movement and sensory signals from the spinal cord to the arms and hands." Brachial plexus injuries "typically stem from trauma to the neck, and can cause pain, weakness and numbness in the arm and hand." *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/brachial-plexus-injuries#:~:text=The%20brachial%20plexus%20is%20a,in%20the%20arm%20and%20hand (last visited March 20, 2023).

2021, the Court remanded the case to the Social Security Administration for further consideration of Milliron's claim. Tr. 1143, 1146.

In early April 2022, the ALJ held a new hearing. Milliron and a vocational expert testified. Tr. 1072–94. On April 20, 2020, the ALJ issued a written decision finding that Milliron was not disabled before May 2019. Tr. 1050–65. The ALJ's decision became final when Milliron filed a Complaint in this Court. *See* 20 C.F.R. § 416.1484.[3]

In his Complaint filed in July 2022, Milliron asserts the following assignments of error:

> 1. The ALJ committed harmful error when he failed to support his RFC with substantial evidence and erred when he relied on the prior ALJ's decision but failed to include all the relevant limitations in his RFC. The ALJ also erred when he failed to comply with the Remand Order of the Appeals Council.

> 2. The ALJ committed harmful error when he failed to properly analyze the opinions of the treating and examining sources in this matter.

> 3. The ALJ committed harmful error when his RFC did not consider the effect of the combination of Milliron's severe impairments and related symptoms on his ability to engage in substantial gainful activity on a sustained and full-time basis prior to his 55th birthday.

Doc. 9, at 1.

---

[3]     When a federal court remands a case to the Social Security Administration, the subsequent ALJ's decision becomes the final decision where, as here, a claimant does not appeal that decision to the Appeals Council. *See* 20 C.F.R. § 416.1484(a), (d).

**Evidence**

*1.     Personal and vocational evidence*

Milliron was born in 1964. Tr. 160. He completed tenth grade and used to perform construction work. Tr. 1247–48.

*2.     Medical evidence*[4]

In November 2012, Milliron had left carpal tunnel release surgery. Tr. 594.

In June 2013, Milliron had a cervical spine laminectomy—an anterior cervical decompression fusion from level C3-4 through C6-7, with grafted tissue and a titanium plate and screws.[5]  Tr. 628, 792.

In September 2013, Milliron saw Charles Misja, Ph.D., for a consultative psychological examination. Tr. 396. Dr. Misja's exam findings showed that Milliron had a blunted affect, depressed mood, poor-to-fair insight, and poor judgment. Tr. 399–400. Dr. Misja opined that Milliron could understand and implement ordinary instructions. Tr. 401. Milliron's problems maintaining attention and concentration "are likely to be in the minimal to intermediate

---

[4]     The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. The time period at issue in Milliron's disability case is from November 2015, when Milliron filed his application, through early May 2019, the date that the ALJ found Milliron's impairments became disabling. Tr. 1065. I recite earlier evidence for context.

[5]     Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited March 20, 2023).

4

range." Tr. 401. Milliron would "likely" have severe problems getting along with co-workers and supervisors and responding to work pressures based on Milliron's reports of problems in those areas.  Tr. 401.

Cervical spine imaging taken in November 2014 showed stable post-surgical changes. Tr. 627–28.

In August 2016, Milliron visited pain management for a follow-up for neck and shoulder pain. Tr. 417. Milliron reported that his neck pain was unchanged since his last visit and he rated his pain an eight out of ten. Tr. 417, 421. His shoulder pain was improved. Tr. 417. Medication helped. Tr. 417. Upon exam, Milliron had a supple, normal range of motion in his neck with no tenderness, no tenderness in his extremities or lower back, and normal motor function and sensation. Tr. 424.

In September 2016, Milliron saw Nurse Practitioner David Kwon for mental health treatment at The Centers for Families and Children. Tr. 719. Milliron reported depression and anxiety. Tr. 719–20. Kwon observed that Milliron was adequately groomed and dressed. Tr. 719. He had clear speech but a circumstantial thought process and he rambled a lot. Tr. 719. Milliron "present[ed] as being in a high amount of pain in his spine with impaired gait." Tr. 719. Milliron reported a history of abuse, which caused irritability, nightmares, intrusive thoughts of trauma, and difficulty sleeping. Tr. 721. Kwon diagnosed Milliron with post-traumatic stress disorder (PTSD) and

generalized anxiety disorder and prescribed medication and counseling. Tr. 726–27.

In February 2017, Milliron had a follow-up appointment at pain management. Tr. 407. The doctor's impression was cervical spondylosis with resolving myelopathy status-post surgery with tissue fusion at levels C3/4 through C6/7 with "titanium plate and screw fixation," cervicalgia, muscle spasms of the neck, myofascial pain, sleep disturbance, and tobacco use disorder. Tr. 410.

In April 2017, Nurse Kwon completed a medical source form on Milliron's behalf. Tr. 745–46. Kwon wrote that Milliron had "[s]ome impairment to focus and attention" and "[g]ets irritable easily around people and [is] generally avoidant of them." Tr. 746.

The next day, Milliron saw clinical psychologist Richard Davis, M.A., for a psychological consultative exam. Tr. 761. Davis wrote that during the exam Milliron was very cooperative and was oriented to person, place, time, and situation. Tr. 763, 765. Milliron appeared with a depressed affect and reported that he received treatment for depression and anxiety. Tr. 765. Davis found that Milliron had "some" intellectual limitations and was "somewhat restricted in his daily activities, living from place to place." Tr. 765.

Davis diagnosed Milliron with adjustment disorder; a personal history of self-harm with a reference to Milliron's past alcohol abuse; borderline intellectual functioning; and PTSD. Tr. 764. Davis wrote that "it sounds as

6

though [Milliron] was always marginal as far as being able to understand, remember and carry out more than just the simplest of instructions." Tr. 764. Davis remarked that during the exam Milliron "paid attention and concentrated and was able to perform at simple repetitive tasks but even then with limitations," and that Milliron reported that his intellectual limitations "always got in the way of being able to do the job well enough to get promoted." Tr. 764. Davis wrote that Milliron "apparently has had some problems throughout his life relating satisfactorily to others but this has been due to the fact that he was under substances much or most of his life." Tr. 765. Milliron also reported having "trouble dealing with the stresses and pressures of employment at times" due to not performing a job well and alcohol use. Tr. 764. Davis opined that Milliron was "seriously limited in his ability to think logically, use common sense and judgment." Tr. 765. Davis commented that if Milliron is awarded disability benefits he "probably should not be considered capable of effective money management until he stabilizes emotionally" and "may need some initial supervision … before this money can be allocated to him to use it in his own best interests." Tr. 765.

In early May 2017, Milliron saw Robin Benis, M.D., for a consultative physical exam. Tr. 767. Milliron reported a history of chronic neck problems, including surgery. Tr. 767. He stated that he experienced chronic neck pain and pain in his head, lower back, and right toe. Tr. 767. He reported PTSD, depression, and an ACL tear in his left knee. Tr. 767. Dr. Benis's exam findings

showed that Milliron had a normal gait and stance. Tr. 768. He walked on his heels and toes without difficulty and could squat. Tr. 768. Milliron did not need help changing or getting on and off the exam table. Tr. 768. He could rise from a chair without difficulty. Tr. 768. He had full, normal strength in his arms, legs, and hands, including when grasping, manipulating, pinching, and performing fine coordination. Tr. 771. Milliron had a normal ability to pick up a coin or key, write, hold a cup, open a jar, button and unbutton, use a zipper, and open a door. Tr. 772. Milliron had a reduced range of motion in his neck. Tr. 772. He had a normal range of motion in his hips, knees, ankles, shoulders, elbows, wrists, hands, and fingers. Tr. 772–74. He had normal reflexes and no sensory deficits. Tr. 769. Left knee x-rays showed mild to moderate degenerative changes most pronounced in the medial joint compartment. Tr. 779. Lumbar spine x-rays showed mild degenerative changes. Tr. 780.

Dr. Benis diagnosed Milliron with a left ACL tear, chronic neck arthritis with metal plate and screws in his neck, chronic neck pain, chronic lower back pain, right big toe status post-surgery, PTSD, and depression. Tr. 770. Dr. Benis opined that Milliron had moderate limitations in standing and walking due to his ACL tear and moderate limitations in flexing and extending his neck due to his neck surgery. Tr. 770.

A few days later in May 2017, Milliron had a follow-up appointment with his pain management doctor. Tr. 796. Upon exam, Milliron had normal sensation and motor strength in his arms and legs. Tr. 801. He had normal fine

motor coordination and a normal gait. Tr. 801. In his neck, Milliron had tenderness, spasms, and a limited range of motion. Tr. 801. In his left shoulder, Milliron had a full, but guarded, range of motion. Tr. 801.

In June 2017, Milliron saw his primary care physician for a follow-up for worsening neck pain radiating to Milliron's left shoulder and lower back pain. Tr. 789. The doctor assessed Milliron with acute left-sided lower back pain without sciatica, cervical radiculopathy, and right main coronary thrombosis. Tr. 791.

In July 2017, Jennifer Romero of The Center for Families and Children completed a form on Milliron's behalf. Tr. 844–45. The form asked what limitations Milliron would have when working and Romeo answered that Milliron would be easily irritable around people, had a low frustration tolerance, and may need frequent breaks. Tr. 845.

In August 2017, Milliron went to an express care clinic for lower back pain. Tr. 858. Milliron reported that his lower back pain started one to two months before his visit and that it had rapidly worsened. Tr. 858. He also had sharp, shooting sciatica pain in his left leg and his legs felt wobbly. Tr. 858. Upon exam, Milliron had a reduced range of motion in his lower back, a slow and cautious gait, and he needed assistance when lying down and sitting up on the exam table. Tr. 860–61. He received a Toradol injection. Tr. 861.

In October 2017, Milliron saw Nurse Kwon for mental health treatment. Tr. 851. Milliron said that he received "sporadic refills" of his medication and

that he had been out of his medications for about a month. Tr. 851. Milliron reported that a week and a half before his visit he began taking his medications again and felt improvement. Tr. 851.

Later that month, Milliron returned to pain management and reported pain in his left shoulder and the left side of his neck. Tr. 885. Milliron stated that he felt pain when lifting items overhead and less pain when reaching. Tr. 885. His pain intermittently caused weakness. Tr. 885. Milliron reported numbness and tingling in his "left neck through left trap[ezius] and left hand." Tr. 885. The doctor's exam showed that Milliron had a limited range of motion in his neck, tenderness, and spasms, and a positive trigger point in his left trapezius. Tr. 890. Milliron's reflexes were "trace" in his left arm and he had a negative Hoffman's sign.[6] Milliron's strength, sensation, fine motor coordination, and gait were normal. Tr. 890.

In January 2018, Milliron saw a new provider at The Center for Families and Children for a medication refill. Tr. 847–48. Milliron explained that Nurse Kwon had adjusted his medications and it "seems like everything's going pretty good." Tr. 848. Milliron said that he still experienced depression and nightmares but that both had improved. Tr. 848. He described his concerns about serious family issues. Tr. 848. The provider's impression was PTSD, persistent depressive disorder, generalized anxiety disorder, severe alcohol use

---

[6]     A Hoffman's sign tests for abnormal reflexes in the fingers. *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1712.

disorder in partial remission, tobacco use, and chronic pain exacerbating his mood symptoms. Tr. 848.

In April 2018, Milliron saw his pain management doctor for a follow-up. Tr. 911. Milliron reported that his Vicodin, muscle relaxant, and over-the-counter Motrin helped his pain. Tr. 911.

In July 2018, Milliron saw internist Ryan Novince, M.D. Tr. 918. Milliron complained of neck and chest pain. Tr. 918. Milliron said that the back of his neck felt stiff and that the pain radiated to his right shoulder. Tr. 919. Dr. Novince commented that Milliron appeared mildly uncomfortable. Tr. 919. Milliron had a limited range of motion in his neck and slightly limited strength in his left arm. Tr. 919. He had normal sensation. Tr. 919. A cervical spine x-ray showed that Milliron's spine was stable during extension and flexion. Tr. 925–26.

In September 2018, Milliron had a left shoulder x-ray that showed mild joint space narrowing consistent with early degenerative changes and rotator cuff tendinosis. Tr. 938. In October 2018, Milliron had an MRI of his cervical spine that showed a new area of spondylosis at C7-T1, resulting in mild encroachment of the anterior cerebrospinal fluid space. Tr. 942. Milliron's spinal cord atrophy and myelomalacia was unchanged from Milliron's 2014 MRI. Tr. 942.

3.  *State agency opinions*[7]

In May 2017, Rannie Amiri, M.D., reviewed Milliron's record and assessed Milliron's physical residual functional capacity (RFC).[8] Dr. Amiri found that Milliron could stand, walk, and sit for about six hours in an eight-hour workday and lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. 128–30. With his left arm, Milliron could not reach overhead and could occasionally reach laterally, handle, and finger. Tr. 129. Milliron also had postural and environmental limitations. Tr. 128–30. In July 2017, William Bolz, M.D., reviewed Milliron's record and adopted Dr. Amiri's findings. Tr. 146–48.

In May 2017, Stanley Kravitz, Ph.D., reviewed Milliron's record and assessed Milliron's mental RFC. Tr. 130–32. Dr. Kravitz found that Milliron could perform simple, repetitive tasks without fast-paced or strict standards or tasks requiring close, sustained concentration. Tr. 131. Milliron could have

---

[7]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[8]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

routine interaction with co-workers and supervisors and could learn and adapt to occasional changes. Tr. 132. In July 2017, Bruce Goldsmith, Ph.D., reviewed Milliron's record and adopted Dr. Kravitz's findings. Tr. 149–50.

    *4.*    *Hearing testimony*

Milliron, who was represented by counsel, testified at the telephonic administrative hearing held in April 2022. Tr. 1074. Milliron stated that he lives in an apartment by himself. Tr. 1079. He can drive but rarely does because his car isn't working. Tr. 1079. Since 2020, Milliron periodically house-sat and dog-sat for people in exchange for a place to stay. Tr. 1080.

When asked whether he could use his left arm for reaching or handling for more than two-and-a-half hours in a workday, Milliron answered that he could not. Tr. 1081. Milliron explained that due to his surgery and shoulder injury he couldn't lift more than 10 pounds with his left arm. Tr. 1081. He can't raise his left arm over his head without using his right arm to help. Tr. 1081. When asked how long he could hold his left arm out in front of him, Milliron stated that he "cannot hold it up very long at all." Tr. 1081.

The ALJ discussed with the vocational expert Milliron's past relevant work as a construction worker. Tr. 1083. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Milliron could perform Milliron's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 1083–84. The vocational expert answered

that such an individual could not perform Milliron's past work, but could perform the following jobs: usher, sandwich board carrier, and furniture rental clerk. Tr. 1084–85. The ALJ asked the vocational expert if her answer would change if the hypothetical individual was limited to occasional, not frequent, handling and fingering with the left hand, and the vocational expert stated that her answer would not change. Tr. 1085–86.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant did not engage in substantial gainful activity during the period in question of November 16, 2015 through May 3, 2019 (20 CFR 416.971 *et seq.*).

2. During the period in question, the claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spines; torn ACL of the left knee; myocardial infarction; left carpal tunnel syndrome; chronic obstructive pulmonary disease (COPD); depressive disorder; anxiety disorder; personality disorder; and post-traumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. During the period in question, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that during the period in question, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except can never reach overhead with the left upper extremity, occasional lateral reaching with the left upper extremity, frequent handling and fingering with the left hand; the claimant can climb ramps and stairs occasionally, never climb ladders, ropes or scaffolds; can frequently balance, occasionally stoop, kneel, crouch and crawl; the claimant can never work at unprotected heights, and can tolerate no more than frequent

14

exposure to work around dust, fumes and pulmonary irritant; and the claimant is able to perform simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work); is able to frequently interact with supervisors, coworkers and the public and can adapt to occasional workplace changes.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born [i]n May [] 1964 and was an individual closely approaching advanced age at all times during the period in question (20 CFR 416.963).

7.  The claimant has a limited education (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  During the period in question, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, from November 16, 2015, the date the application was filed, through May 3, 2019. As noted above, the claimant was previously found disabled beginning May 4, 2019 (20 CFR 416.920(g)).

Tr. 1056–65.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each

element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*,

800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

    *1.   This Court reviews the ALJ's 2022 decision*

Milliron's first argument—that the ALJ's decision is not supported by substantial evidence—fails because Milliron attacks the wrong decision. Milliron describes errors which he believes are contained in the ALJ's June 2020 decision. Doc. 9, at 11–13. But Milliron appealed to this Court the ALJ's June 2020 decision and the Social Security Administration stipulated to a remand, which the Court approved. Tr. 1143, 1146. The Appeals Council then vacated the ALJ's June 2020 decision. Tr. 1149. The ALJ held a new hearing, Tr. 1072–94, and issued a new decision in April 2022, Tr. 1050–65. So the ALJ's April 2022 decision is the Social Security Administration's final decision and the decision this Court reviews. *See* 20 C.F.R. § 404.981; *see also Londo v. Comm'r of Soc. Sec. Admin.*, No. 3:15-cv-01523, 2016 WL 11260323, at *11 (N.D. Ohio June 13, 2016) (the court reviews the ALJ's later final decision, not the ALJ's earlier vacated decision).[9]

    *2.   Milliron's testimony*

Milliron recites some of his testimony at the 2020 and 2022 administrative hearings. Doc. 9, at 13. He concludes, "the ALJ failed to

---

[9]    Report and recommendation adopted, 2017 WL 891783 (N.D. Ohio Mar. 7, 2017).

properly evaluate whether Milliron was limited to only occasional handling and fingering with his left upper extremity." *Id.* Milliron's argument fails.

First, Milliron didn't include any of his 2020 testimony in the *Statement of Facts* section of his brief, as the Initial Order in this case requires him to do.[10] *See* Doc. 5, at 2–4 (explaining that facts relied upon in support of an argument must be in the *Statement of Relevant Facts* section of the brief and that any fact in the transcript that is not in the *Statement of Relevant Facts* section "may be deemed non-essential to the determination of the issues presented."). So this Court may deem Milliron's 2020 testimony non-essential to Milliron's issues presented.

Even so, citing testimony without explaining how that testimony renders the ALJ's decision erroneous is not a recipe for reversal. Milliron cites three statements he made at the 2020 hearing: "any movement could trigger the pain in his shoulder and neck," Milliron's right arm was better than Milliron's left arm, and Milliron "was unable to hold things in his left hand." Doc. 9, at 13 (citing Tr. 73–74). Milliron's description of his testimony is not entirely accurate. At the 2020 hearing, Milliron explained the scenarios that could trigger shoulder and neck pain—walking up or down stairs, stepping onto something, turning around, and standing up. Tr. 73. When asked if he

---

[10]    Milliron's counsel has been previously warned about this practice. *See, e.g., Mencke v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-2298, 2022 WL 2758577, at *1 n.2 (N.D. Ohio July 14, 2022).

could hold an item with his left hand, Milliron answered "[n]ot very well," and explained that he's "always worried about something going wrong." Tr. 74. That testimony does not lead to a conclusion that the ALJ "failed to properly evaluate whether Milliron was limited to only occasional handling and fingering with his left upper extremity," as Milliron asserts. Doc. 9, at 13. Milliron's cited 2022 testimony doesn't advance Milliron's argument either. Milliron says that he was asked about "reaching or handling objects" with his left arm and answered that he could not lift over 10 pounds or raise his arm over his head. Tr. 1081. But Milliron's answer only addressed the *reaching* question, not the *handling* question, and still doesn't point out an error in the ALJ's decision.[11]

The ALJ detailed the history of Milliron's cervical spine impairment, including Milliron's 2013 surgery and subsequent cervical spine imaging. Tr. 1059–60. The ALJ discussed the imaging results of Milliron's left shoulder. Tr. 1060. The ALJ wrote that despite exam findings showing that Milliron had tenderness and limited range of motion in his cervical spine, Milliron retained normal sensation, reflexes, gait, and good to normal muscle strength "at 4/5 to

---

[11]     Milliron cites to a portion of the Appeals Council's 2021 remand order but mischaracterizes what the Appeals Council wrote. Milliron states, "… as previously noted by the Appeals Council in the Order of Remand after the Court remanded this matter, *Milliron testified that the problem was not his hands,* but he had sharp pain from his neck to fingertips." Doc. 9, at 13 (citing Tr. 1149) (emphasis added). But the Appeals Council found that the ALJ's description in the ALJ's 2020 decision—the problem was not Milliron's hands—was "not an accurate characterization" of Milliron's testimony. Tr. 1103, 1149.

5/5." Tr. 1060. The ALJ noted Milliron's history of left carpal tunnel syndrome and Milliron's carpal tunnel release surgery in 2012. Tr. 1060. The ALJ commented that Milliron complained of numbness and tingling in his neck down to his left hand, but, the ALJ explained, Milliron's exam findings showed that Milliron maintained normal reflexes, sensation, and fine motor coordination. Tr. 1060. The ALJ acknowledged that Milliron had at times demonstrated slightly decreased muscle strength in his left arm but that on other occasions Milliron demonstrated normal muscle strength. Tr. 1060. The ALJ recited the physical exam findings that consultative examiner Dr. Benis assessed in May 2017: Milliron had normal grasping, pinching, manipulation, and fine coordination abilities and a normal range of motion in his hands, fingers, and wrists. Tr. 1060. The ALJ concluded, "[t]hese relatively normal findings establish that the claimant can perform frequent handling and fingering with the left upper extremity. They do not support a finding that the claimant needs to be limited to only occasional handling and fingering with the left hand." Tr. 1060. Milliron doesn't challenge any of those findings.

In sum, Milliron cites portions of his testimony at two administrative hearings without identifying an error he believes the ALJ made in the 2022 decision. So Milliron's argument fails, and any purported additional argument Milliron intended to make is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

In his reply brief, Milliron asserts that the "key factor is that the ALJ failed to comply with the remand order." Doc. 11, at 2. But Milliron didn't argue that the ALJ failed to comply with the remand order in his opening brief. His new argument in his reply brief is not proper. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (an issue raised for the first time in a reply brief is waived). And Milliron's new argument in his reply brief fails. Contrary to Milliron's assertion, the Appeals Council did not order the ALJ to "adopt the prior ALJ finding that [Milliron] was limited to no more than occasional use of the left upper extremity[.]" Doc. 11, at 2; Tr. 1151 (Appeals Council's instructions for remand).

### 3. *Opinion evidence*

Milliron claims that the ALJ erred "when he failed to properly analyze the opinions of the treating and examining sources." Doc. 9, at 14.

#### 3.1 *Treating sources*

Because Milliron filed his application before March 27, 2017, the ALJ evaluated the medical opinion evidence under 20 C.F.R. § 416.927.[12] Tr. 1109. Under 20 C.F.R. § 416.927(c)(2), known as the "treating physician rule," the

---

[12] New regulations governing opinion evidence came into effect for applications filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c.

ALJ must give a treating source opinion controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And ALJs must provide "good reasons" for the weight they give to treating physicians' opinions. 20 C.F.R. § 416.927(c)(2).

A "treating source" is an "acceptable medical source" who provides a claimant with medical treatment or evaluation and who has an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502 (effective June 13, 2011 to March 26, 2017). Generally, the Commissioner will consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant saw a provider "with a frequency consistent with accepted medical practice for the type of treatment []or evaluation required for [the claimant's] medical condition." *Id.* "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]" *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

Milliron describes Nurse Kwon and Jessica Romero as *treating sources*. Doc. 9, at 15. But nurses aren't *acceptable medical sources* under the regulations that apply to Milliron's application. *See* 20 C.F.R. 416.902 (effective

June 13, 2011 to March 26, 2017); 20 C.F.R. § 416.913(a) (effective Sept. 3, 2013 to March 26, 2017) (defining *acceptable medical sources*).[13] So Nurse Kwon is not an *acceptable medical source* and the ALJ did not have to follow the *treating physical rule* when evaluating Kwon's opinion. *See Brown v. Comm'r of Soc. Sec.*, 591 F. App'x 449, 451 (6th Cir. 2015) ("A nurse practitioner is not an 'acceptable medical source'") (citing 20 C.F.R. § 416.913(a)). Romero has no credentials next to her name. Tr. 842–46. The ALJ found that Romero is not an *acceptable medical source*, Tr. 1063, a finding that Milliron does not challenge. So the ALJ was not required to follow the *treating physical rule* when evaluating Romero's opinion, either.

Instead, the ALJ was required to evaluate the opinions of Kwon and Romero under 20 C.F.R. § 416.927, *Evaluating opinion evidence for claims filed before March 27, 2017*. That regulation states that, "[r]egardless of its source," the ALJ will weigh every opinion and consider the examining and treatment relationship, supportability and consistency of the opinion, the specialization of the source, and other factors. 20 C.F.R. § 416.927(c). Here, the ALJ explained that he gave "little" weight to Kwon's opinion—Milliron has "some impairment to focus and attention" and gets irritable easily around people—because Kwon's opinion was "vague and [did] not set forth specific limitations." Tr.

---

[13]    The new regulations that came into effect for applications filed after March 27, 2017, include licensed advanced practice nurses and licensed physician assistants as *acceptable medical sources*. *See* 20 C.F.R. § 416.902(a) (effective March 27, 2017 to Oct. 14, 2018).

1062–63. The ALJ gave little weight to Romero's opinion—Milliron is easily irritable around people, has a low frustration tolerance, and may need frequent breaks—because Romero's opinion was "also vague." Tr. 1063. Vagueness is a valid reason to discount opinion evidence. *See Sweeney v. Comm'r of Soc. Sec.*, No. 1:19-cv-964, 2020 WL 2812721, at *12 (N.D. Ohio May 29, 2020) (collecting cases). Milliron doesn't challenge the ALJ's findings or reasoning. So Milliron doesn't show that the ALJ erred when he evaluated Kwon's and Romero's opinions.

### 3.2  Examining source

Milliron argues that ALJ erred when he evaluated Dr. Davis's opinion.[14] Doc. 9, at 16. Dr. Davis examined Milliron once and is considered an *examining source*. So the ALJ was required to evaluate Dr. Davis's opinions under 20 C.F.R. § 416.927. The ALJ considered Dr. Davis's opinion and explained:

> Partial weight is given to the opinion of Richard Davis, MA who performed the consultative psychological exam on April 25, 2017. He indicated that it sounds as though the claimant was always marginal as far as being able to understand, remember and carry out more than just the simplest of instructions and it is difficult to determine whether he didn't do well on jobs because of these limitations or the alcohol but it was probably a combination of both. He also noted that the claimant was able to pay attention and concentrate at simple repetitive tasks but even then with limitations. These findings, while vague, are generally consistent with the overall evidence, which establishes that the claimant has moderate limitations in understanding, remembering or applying

---

[14]    Milliron complains that the ALJ erred when he evaluated "all" of the opinion evidence. Doc. 9, at 17. But he only alleges that the ALJ erred when evaluating the opinions of Kwon, Romero, and Dr. Davis. Milliron has waived any challenge to opinion evidence other than the opinions of Kwon, Romero, and Dr. Davis.

information and in concentration, persistence or maintaining pace and is able to perform simple, routine and repetitive tasks but not at a production rate pace (e.g. assembly line work). However, he also indicated that the claimant had trouble getting along with supervisors and coworkers in his work settings because he couldn't do the job very well and also because of his involvement with alcohol and noted that the claimant says he would have trouble dealing with the stresses and pressures of employment at times for the same reasons. These findings are based on the claimant's self-reports and not the objective evidence in the record, including treatment records from the Center for Families and Children and MetroHealth. The overall evidence establishes that the claimant has moderate limitations in interacting with others and in adapting or managing oneself and he is able to frequently interact with supervisors, coworkers and the public and can adapt to occasional workplace changes (Exhibit B5F).

Tr. 1062. Milliron's sole argument is that the ALJ's last sentence in this passage is "contrary to" Dr. Davis's opinion. Doc. 9, at 16. But Milliron doesn't challenge the ALJ's stated reasons for his conclusion—that Dr. Davis's opinion is vague and based on Milliron's self-reports rather than objective evidence. And this matters because vagueness is a valid reason to discount opinion evidence. *See Sweeney*, No. 1:19-cv-964, 2020 WL 2812721, at *12 (collecting cases); *see also Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 564 (6th Cir. 2014) ("the ALJ is not required to simply accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence") (citing 20 C.F.R. § 416.927(b)).

In his reply brief, Milliron argues that the ALJ erred because he didn't provide *good reasons* for not giving controlling weight to the opinions of the

one-time consultative examining doctors Davis, Misja, and Benis. Doc. 11, at 2. Even if the Court considers Milliron's argument which he improperly raised for the first time in a reply brief, Milliron's argument fails. This is so because the *good reasons* requirement is only for *treating source* opinions, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004), and one-time examining consultants are not *treating sources*.  *See* 20 C.F.R. § 416.902 (effective June 13, 2011 to March 26, 2017) (A "nontreating source means a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you. The term includes an acceptable medical source who is a consultative examiner").

### 4.  *Combination of impairments*

Milliron argues that the ALJ erred when he assessed Milliron's RFC because the ALJ didn't "consider the effect of the combination of Milliron's severe impairments and related symptoms on his ability to engage in substantial gainful activity on a sustained and full-time basis[.]" Doc. 9, at 18. In support of his argument, Milliron recites medical evidence that he did not include in the *Statement of Relevant Facts* section of his brief, as he was required to do. Doc. 9, at 18–19; *see* Doc. 5, at 2–4. Then Milliron concludes, "The ALJ erred when he failed to consider the combination of Milliron's impairments and find that he was unable to engage in full-time sustained work activity." Doc. 9, at 20.

The ALJ stated that he "careful[ly] consider[ed] the entire record" when assessing Milliron's RFC. Tr. 1058. That statement is sufficient to show that the ALJ considered Milliron's impairments in combination even if the ALJ discussed Milliron's impairments individually. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851 (6th Cir. 2020). Milliron does not attempt to craft an argument to show that his case is different from *Emard*. His argument fails.

### 5. *Reports of pain*

Milliron argues that the ALJ failed to consider Milliron's pain and "the residual effects of Milliron's residual problems related to his cervical spondylosis and degenerative disc disease status post fusion of C3-7." Doc. 9, at 21. Milliron contends that the ALJ "failed … to properly consider Milliron's disabling pain and the fact that it would likely result in [Milliron's] inability to sustain attention and concentration." *Id*.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther

factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

Milliron argues that the ALJ failed to "properly consider" Milliron's pain and "failed to articulate any rationale beyond a boilerplate paragraph." Doc. 9, at 21–22. Not so. The ALJ considered Milliron's complaints of chronic, radiating neck pain. Tr. 1059. The ALJ detailed Milliron's cervical spine diagnoses, imaging, and 2013 cervical fusion surgery. Tr. 1059. The ALJ commented that post-surgical imaging showed stable findings other than new, mild spondylosis at one level of Milliron's thoracic spine. Tr. 1059–60. The ALJ detailed Milliron's left shoulder x-ray showing mild joint space narrowing and likely rotator cuff tendinosis and Milliron's lumber spine x-ray showing mild degenerative changes. Tr. 1060. The ALJ wrote that although physical exams showed that Milliron had tenderness and limited range of motion in his cervical spine, Milliron also had normal sensation, reflexes, good-to-normal strength, and a normal gait. Tr. 1060. The ALJ concluded that the records note that, overall, Milliron's cervical spondylosis is stable. Tr. 1060.

The ALJ discussed Milliron's left carpal tunnel syndrome and his complaints of numbness and tingling in his neck, left trapezius, and left hand.

29

Tr. 1060. The ALJ remarked that physical exam findings were normal or, at most, showed slightly decreased muscle strength in Milliron's left arm. Tr. 1060. The ALJ concluded that those "relatively normal" exam findings didn't support Milliron's assertion that he was more limited in using his left hand as alleged. Tr. 1060. The ALJ wrote that despite Milliron's history of a left ACL tear in his knee, records show that Milliron had a normal gait with good to normal muscle strength and normal sensation and reflexes. Tr. 1060.

The ALJ detailed Milliron mental health records and exams and listed Milliron's symptoms. Tr. 1061–62. The ALJ commented that Milliron had generally normal mental exam findings; he was stable on his medication regimen; and he was making progress in his counseling sessions. Tr. 1061.

In sum, the ALJ considered Milliron's reports of symptoms, including pain, and explained why he did not fully credit them. Those reasons are sufficiently specific to make clear how the ALJ evaluated the evidence. Milliron does not challenge any of the ALJ's findings listed above. And his citations to case law with no attempt to explain how those cases warrant reversal in this case are not persuasive.[15]

---

[15]    Milliron also argues that the ALJ didn't evaluate the statements Milliron made in his function report. Doc. 9, at 22. But an ALJ is not required to discuss every piece of evidence. *See Kornecky*, 167 F. App'x at 507. Indeed, Milliron doesn't discuss the statements he made in his function report.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: March 20, 2023

> _/s/ James E. Grimes Jr._
> James E. Grimes Jr.
> U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. _See Berkshire v. Beauvais_, 928 F.3d 520, 530-531 (6th Cir. 2019).